Good morning. May it please the court, Chris Cravey for Appellant ALE USA Inc. The infringement judgment in this case... I'd like to start with your construction of the adapted limitation. Yes, Your Honor. Okay. In the blue brief at 22, you say, the term adapted was purposely added to the 012 patent claims to impart an additional limitation on the other patents in suit. And you cite me to the patent, JA 186A7, column 18, line 62, and so on. How does this cite... All you're citing to me is the claim. How does that citation demonstrate the purpose of adding the adapted limitation? And is there any prosecution history to support you? Well, perhaps the cite could have been better. There is evidence in the specification to support our argument, Your Honor. Well, okay. When you say, perhaps it could have been better, you better tell me something that's better. Yes. Well, the word adapted was added to the claims of the 012 patent to impart a new meaning. It's the only patent in which adapted is in the claim. It's also cited in the title of the patent, System and Method for Adapting a Piece of Terminal Equipment. And we understand from the specification what the patentee meant when he said adapted, because what the specification tells us is that there was existing network equipment that existed in the art prior to the 012 patent. There were PCs, there were computers, there was printers. And what the patent tells us is these pieces of equipment... I understand the logic of your argument. What I want to know is, you said there was intention. Other than facial comparison, do you have any evidence? Do you have any prosecution history evidence, for example? Well, I do not have evidence of it being added by way of amendment in the prosecution history. I have evidence in the fact that it was added. It's a word, it's a limitation in this claim. The word adapted exists in the preamble. Intentionally, we can understand, because the patentee wouldn't have put it in there by accident. And so that's what we meant with our argument, in that it's added by intention and that it appears in this patent and doesn't appear in the other patents. In the yellow brief, you say it was routine to modify a computer motherboard with memory in RAM slots or add a new CPU to a motherboard socket. You don't cite anything. What's your authority for that statement? Other than, as a hobbyist, I might know that. Just the state-of-the-art, Your Honor, at the time of the patent filing. Certainly, even if the court was inclined to disagree and that the evidence did not support a finding that it was routine to modify motherboards at the time of the invention, the court has said— Was there judicial notice of that? Well, Your Honor, even if the court's not inclined to support that argument, the court has repeatedly said that claims need not encompass all disclosed embodiments. In fact, in the TIP systems case we cited, this court said that the precedent is replete where this is the case, where claims do not, in fact, encompass all disclosed embodiments. So if the court was inclined to be of the opinion that appellant's construction would exclude that disclosure in the patent specification, our construction is still correct as a matter of law because it's supported by an overwhelming portion of the intrinsic record, the specification, and the claims themselves. I'm just asking about the parts of your brief that give me pause. That's all. I understand, Your Honor, and I do not have a cite for you in the intrinsic record to say that— Let's talk about the construction of the two limitation. That can be an important word. In the blue brief at 38, you say Pazita would understand that the general term, Ethernet terminal equipment, does not expressly or inherently disclose structure sufficient to perform the three functions required. You don't cite any support for what Pazita would believe. What's your support for that? Well, Your Honor, it would be what the patentee tells us in the specification, that there was existing Ethernet equipment that existed in the art, and this is in column five of the 012 patent lines 14 through 17, where it talks about existing pieces of equipment that could do conventional Ethernet communications. What the specification tells us is that this equipment that existed in the art at the time was incapable of performing these functions. Virtually the entire specification is devoted to the notion of adding new structural components to these existing pieces of equipment to perform the functions in which the patentee believed distinguished over the prior art. Figures one, figures two, figures three illustrate adding this new piece of structure, the remote module, that will perform these functions. Nowhere in the specification does the patentee say that these existing pieces of equipment could do these functions believed to distinguish over the prior art. In fact, the specification says exactly the patentee teaches, therefore a method for permanently identifying an asset. You're talking about the 012 patent. Yes, Your Honor. Both parties agreed there's a common specification, and we cite to the 012 patent in our briefing for the intrinsic support. So if we look at column one of the 012 patent line 66 through 67, the patentee says, therefore a method for permanently identifying an asset by attaching an external or internal device to the asset and communicating with that device using existing network wireless wiring or cabling as desirable. So what that passage is saying is that we're going to add something new to this existing Ethernet terminal equipment, and that theme is carried, Your Honor, into column four lines 53 through 56, where the patentee says, in general, the central module monitors remote module circuitry that may be permanently attached to remotely located electronic workstations such as personal computers. So what this is teaching us is that the structural configuration of existing Ethernet terminal equipment that existed in the art at the time the patents were filed was incapable of performing these claimed functions. You say in the blue brief that the district court improperly expanded the scope of physically connect by rewriting the claim to encompass a system that is merely configured to be construed. The district court said no further construction of the term physically connect is necessary. Show me where the district court specifically reconstrued the limitation to require only that it be configured to be connected. Okay. Your Honor, goes on and appendix 39 through 40. I'm looking at 40 right now. Well, the, and starting on appendix 39, the court improperly relies on the doctrine of claim differentiation to say that the scope of claim one of the 760 patent does not require an actual physical connection between the two constituent components, the central and the terminal pieces of equipment. Basically, the court is resolving the party's dispute. The dispute before this court was what the scope of claim one is. Does claim one require a physical connection between these two components? It was our position that the words as written physically connect, data signaling pairs of connectors that physically connect from a central device to a terminal device in and of themselves require that physical connection. The, the, the patentee, the appellee relied on claim differentiation to broaden that claim. The claim doesn't say operable to physically connect, capable of configure, of physically connecting. It says physically connect. And so it's our contention, Your Honor, that the plain and ordinary meaning of the claim as drafted requires a physical connection. What evidence supports your blue brief that the system would be inoperable if the first and second pairs are not physically connected? Well, it would be a language of the claim itself, Your Honor, that the functional requirements in the claim, different, drawing different magnitudes of DC, of DC current of, would, would, would not be capable of being performed if the physical connection didn't actually exist. This is a, this is a system claim, Your Honor. It, it talks about two components being in the system and the claim expressly recites that these two components are in fact physically connected to each other. What was the proof, I guess you all, infringement was not actually tried, right? That's correct, Your Honor. So before trial, what was the, as applied to the why they met this claim element if it doesn't require an actual physical connection? Full stop. What, what was, what were the party's positions with respect to infringement? I'm sorry, Your Honor. I'm trying to get a, what I do not currently have in my head, a concrete idea why this dispute matters. Oh, this dispute matters, Your Honor, because ALE doesn't sell complete systems. The, and nor did APELI argue in its expert reports that we did. While we might still sell the constituent components, a terminal device, or a central piece, nowhere do we sell the two pieces physically connected together. And APELI's infringement read at the district court was based solely on the time of sale, when these products are sitting on the shelf available for store, there is, in fact, no physical connection between what they allege is a central component and what they allege is a terminal component. And there was no claim of contributory or induced infringement, is that right? Well, I think they did have claims, in fact, of inducement and contributory infringement, but that was part of the stipulation. Right, but if the thing you just said is the only reason it makes a difference, that is, you can't use these things without the other piece, they don't sell the other piece, everybody who buys their piece is going to buy the other piece and connect it. What is the difference in terms of ultimate infringement under any subsection of 271 you care to name? Well, the only, they had no, well, for contributory or an indirect infringement, as the court is aware, you have to show some act of direct infringement, and they had no evidence, Your Honor, of direct infringement of any system of ALE actually being physically connected, and so they would have been incapable or they would not have been able to show the indirect infringement. Your position is without the physical connection these things would not be operable, is that right? For direct infringement, that's correct. Right, and is it agreed that there were some large number of working units out in the world? No, Your Honor, it was not agreed, and we contested that position, and they had no evidence to show that, in fact, there was a working system made, offered for sale, or sold by ALE, so their proof on the indirect infringement. No, no, I didn't say about a working system sold by ALE, I meant, I said out there in the world, what was damages based on? Their damages were based on the number of POE-capable ports, but to answer your question... Units were being sold, and in your view, those, a buyer, unless he physically connects them, should just throw it in the trash? No, our position is... People were probably interested in doing the combination, if they kept buying them. I mean, in your view, that it's inoperable, if not? Well, that's certainly conceivable, Your Honor, but it's their burden of proof to show, as you just pointed out, that somewhere out in the world, there was, in fact, a system that was put together with these components. They had no evidence that anywhere in the world, these systems existed, that ALE, that they had... I understand your point, but it's still their burden of proof to show that, in fact, that was the case, which they did not do. You've almost... We'll reserve a couple minutes of rebuttal on the other side. Thank you, Your Honor. Good morning, Your Honors. I'd like to pick up where you left off, Judge Toronto. The dispute on physical connection would not have made a difference. Carmar had two infringement theories, one based on sale of the component parts as direct infringement under St. Clair Intellectual Property, where sale of the parts would constitute direct infringement and contributory infringement. Had we gone to trial, we would have presented evidence for both of those theories. The fact ALE insists on maintaining this operational state type of non-infringement defense, even though that argument has been rejected repeatedly by the District Court in Markman and again on summary judgment. But the Court was correct in rejecting this physical connection argument that ALE makes, based on the language of the claim and claim differentiation under Claim 71, the dependent claim that says they're actually connected. In the yellow brief at 5, ALE identifies a portion of a quotation that you omitted in the red brief at 15 and 16, which indicates that harmless error may occur where the evidence in support of a verdict was so overwhelming that the same verdict wouldn't necessarily be reached absent the error. Do you intentionally omit that portion of the quotation? No, Your Honor. I believe that was for a different proposition. Under this Court's precedent and Comcast IP and Smith-Klein-Beacham, the main issue is that they failed to show any error, any prejudice in their opening brief. And without giving this Court any context, to Judge Toronto's point about why this would matter, this physical connection dispute, it leaves this Court to simply take their word for it that if they were to receive their construction of physically connected, they wouldn't have stipulated to infringement, they'd have a new trial for infringement. I have to say, it's a dangerous precedent to set because it would allow any defendant to stipulate to infringement, get a free trial on invalidity, damages, fraud, reach of contract, everything else, and then come up to this Court to identify just one error of claim construction and have a new trial on infringement. Certainly that would be unfair to the patent holder and a waste of time. They needed to identify the prejudice in their opening brief and they failed to do that. And, Your Honor, to your point on adapted, there was no prosecution history on the word adapted, as you pointed out. It's not repeated in the body of the claim. It is not a word that needs to import additional limitations beyond the entire body of the claim. The Court was correct in rejecting ALE's attempted additional limitation, which would turn it into a product by process claim, requiring a retrofitting limitation, where then infringement would depend on the order in which these products were manufactured. Do you agree that the preamble of Claim 31 of the 012 patent is limiting? Yes, Your Honor, we did. And that's because in the body of the claim, it repeats. It's an Ethernet terminal device. The body of the claim doesn't repeat the word adapting. What ALE is proposing is that each word of the preamble would need to have additional limitation above and beyond the entirety of the claim. Now, their main argument is that the word adapted, with or without, provides no more meaning, no more patentable distinction, or no limitation. That's incorrect. If you have two preambles, in this case of Claim 31, an adapted piece of equipment, well, as the Court found, to meet the preamble, you must have the piece of Ethernet equipment and meet all the other limitations in the claim. Without the adapted part, any prior art piece of equipment would meet the preamble. It is limiting in the context of the preamble of Claim 31. It just doesn't import additional limitations beyond the entirety of the claim, and it certainly would be improper to read a retrofitting limitation or a temporal limitation. And again, to the prejudice, Your Honor, even ALE's own expert admitted that a device manufactured with this invention would still meet the term adapted under their incorrect claim construction. And if I might turn briefly to the two phrases, Your Honor, ALE and its experts all admitted, and the Court noted, that these structural limitations were known and understood by a person of ordinary skill in the art. That alone is enough to meet the test under Williamson, under Skye versus Meingeek and Media Rights Tech to defeat a claim that they invoke 112.6 means plus function. I'm more concerned with the damages models. Thank you, Your Honor. I know this wasn't addressed. If you have specific questions, I would address it. Otherwise, I could just say briefly. How can we accept that the 250 royalty was reasonable when both Mr. Mills and the District Court previously acknowledged that that rate failed to apportion for apportionment? The District Court first rejected Mr. Mills' methodology because he stated he didn't have to account for any potential increase in value due to standardization due to Dr. Mattesetti, the technical expert's statement and opinion that there was an absence of non infringing alternatives. The District Court rejected that and said, go back and do it again. Make sure you are accounting for standardization and don't rely on the absence of non infringing alternatives. Where in the record did Crimart demonstrate that patent related features of the patents in suit are the basis for customer demand? We did not, Your Honor, and nor did we use the entire market value rule. The apportionment began with the royalty base in this case. The royalty base, as this Court has made clear in Syro and in Erickson, apportionment can be performed in both the base and the rate. In this case, Mr. Mills did both. Starting with the royalty base of Power over Ethernet ports. Each of those ports includes the patented inventions. Did Mr. Mills rely on license agreements stemming from litigation? He did, Your Honor, and I believe that has been acceptable by this Court in Erickson and Rescue Net and other cases. And notably, and most importantly, all the evidence, the Crimart licenses, Network One licenses, the Power over Ethernet premium, were admitted into evidence without objection. ALE never once objected in its two dauberts and any time during trial to any of the evidence coming in. What they complain about now is the weight, and that went to the jury, where two experts looked at the evidence, critiqued it, analyzed it, made arguments, and the jury made its determination. Tell me how litigation settlement licenses are comparable. Well, Your Honor, every license negotiated for a patent has some specter of litigation. A patent owner has no other enforcement mechanism other than to file suit. So the hypothetical negotiation assumes that's not the case. Unfortunately, Your Honor, if we are talking about, if two companies are talking about taking a license and we approach you, if you That's true. If every company refuses. If they refuse. Now, there were not all of the licenses in this case were negotiated during litigation. There were a few that weren't. But at the same time, just the specter of litigation isn't enough to make the license agreements themselves inadmissible. And I believe that proposition was, once again, in Erickson. As a matter of fact, in this case, you have licenses from Primar directly on point, about 30 licenses in total. About a dozen were running royalty licenses. Some were a per port rate, in dollar figures per port, and then a royalty percentage of net revenue. And Mr. Mills relied on both. The same was true for Network One's comparable licenses. Dollar figures per port, percentage of net revenue. Why didn't Mr. Mills set the royalty rate at the rate paid to Network One? It was up to his methodology to form an opinion. In his opinion, what he did is he actually used Primar's lowest rate from all of its running royalty licenses of $2.50. Had Mr. Mills, and he testified this at trial, used a percentage base, the royalty rate would have been much higher. Primar's royalty rates and Network One's royalty rates on a percentage of net revenue were much higher and would have resulted in a per port royalty rate much higher. He capped it at $2.50, thinking that that was reasonable based on all the Georgia-Pacific factors, accounting for the value of these patents with respect to the products and accounting for any potential artificial value due to standardization. But again, Your Honor, the question is, did the court abuse its discretion in allowing him to testify about this opinion when he had objective evidence that was admitted without objection that was tied to the facts of this case? This is certainly not a case where he arrived at an opinion disconnected from all evidence or giving some mere lip service to the Georgia-Pacific factors. Are you going to talk about your cross-pill now? Yes, Your Honor. Your cross-pill seeks attorney's fees. If we reverse any portion of the district court's judgment, your cross-pill is removed. I don't believe that's correct, Your Honor. I believe if you reversed, we would still be the prevailing party on most, if not all, of ALE's counterclaims and offenses, particularly things like the antitrust counterclaim. ALE chose to put itself in the plaintiff's shoes, bring a meritless claim, fail to even present expert opinion on it, maintain it through summary judgment, telling the court during the letter briefs for summary judgment that it could trust claim to the jury without any expert testimony against a party that it alleged was a non-practicing entity, was incapable of proving market power, and it did that through pretrial. And if ALE's conduct was on behalf of a patent owner, under this court's precedent in cases like Adjusticam, I don't think there'd be much hesitation in finding it was an exceptional case. ALE also did what Adjusticam did in continuing to pursue an objectively baseless, non-infringement argument, post-Markman, and worse than Adjusticam, through summary judgment, telling the district court that they had affirmatively disproved infringement because while the products are in the box, there's no power flowing, you can't meet the patent couple-across claim element. And they repeat that today in their briefing and in their argument. Still, when they sell the products, they cannot possibly infringe. If one of those alone would be enough to find a patent owner liable for an exceptional case. In this case, they did so much more. They maintained fraud, implied license, and breach of contract claims knowing they were legally and factually impossible. They're appealing the jury instructions on fraud when they are incapable of proving the elements. Even if they were given their jury instructions, the jury instructions were improper because they would have created a non-existent cause of action for In this case, you have a company that didn't exist until over. What was the fraud instruction that the other side proposed? So. I know what the one is that was given. Right. Yes, Your Honor. I believe that is in our reply brief on page 19, and where we show their proposal in red line. This is the gray brief? Gray brief? Final. The final reply brief. I apologize. I don't know the colors. But on page 19, which we provided in red line, if we, the court were to adopt their improper instruction, it would be that Crimar was liable for fraud by making a misrepresentation of material fact in the abstract. So it did not propose a instruction that was different from what was given, but used language expressly from the Exxon decision, which is not as strong as eliminating all of the references to whoever might ultimately get the fault, the misleading impression from the omission. It's a somewhat narrow, it is a narrowed, in fact, very much narrow. Very much narrow. But it's not, strictly speaking, in Exxon, though it was in 79, 79, whatever that. Yes, Your Honor. The middle level court that the Fifth Circuit then picked up in its non-precedential decision, which Exxon didn't repudiate, but they didn't propose something between their view, which is, which I think Exxon actually expressly repudiates. Correct, Your Honor. And the one that was given. That's correct, Your Honor. They maintained this fraud in the abstract position that had Crimar done something wrong in the year 2000, any company created later could claim fraud, breach of contract, implied license for these alleged acts or omissions. And most importantly, that was based on a fabricated duty, which the court, the district court found as a matter of law. Crimar owed no duty, and Ailey is not appealing that. But the jury was not bound by the district court's determination of that question on the equitable question of equitable estoppel, was it? No, Your Honor, but it was the jury. But the jury found that there was no such duty. Well, the jury rejected. That doesn't quite make it fabricated. Well, the jury rejected their position wholesale, but it was the same fact and legal. I'm sorry, what does wholesale mean? It means it rejected their fraud, breach of contract, implied. Well, the judge removed the implied license, but it rejected their fraud and breach of contract. But the entire argument, the basis, was that Crimar had a duty to do something. And the jury rejected that. If you don't mind, I will reserve my last minute for rebuttal. Thank you. Your Honor, just to pick back up on that fraud discussion that was just taking place, Ailey did, in fact, object to the inclusion of the use of Ailey in the fraud by omission and fraud by misrepresentation instruction. And the reason why we did, Your Honor, is that both parties agreed that Texas state law applied here. And under the Exxon v. Emerald case that we cited, the Texas Supreme Court held that the misrepresentation or omission did not need to be made to the defrauded party. In that case, Exxon had submitted well-plugging reports to the Texas Railroad Commission, and those reports were relied on by a subsequent operator in the field. Tell me if I'm wrong about this. So the Exxon decision said, I think in terms, it is not enough all by itself that a fraud, in that case, had been committed on the Railroad Commission, and then anybody who happened to rely on what was told the Railroad Commission was omitted. Actually, in that case, it was not an omission. But what was told to the Railroad Commission doesn't get a fraud action. In fact, the misrepresentation has to either be intended to go to the later would-be plaintiff, or the would-be plaintiff has to be not just within some foreseeable range of expectations, but especially likely to be one of those people. And all of that was addressed by the Exxon decision in ruling on the reliance element. And the Exxon decision didn't repudiate the 79-79 airport garage standard, which is practically verbatim what the district court used here. And the Fifth Circuit, in a non-precedential decision in 2014, adopted, not non-precedential, adopted the 79-79 airport garage statement. Do I understand, is that the lay of the legal land here? I think that is the lay of the legal land. But Exxon would not have been, even Exxon would not have been satisfied by your proposed instruction, which would have allowed, to translate it into Exxon terms, a mere fraud on the Railroad Commission. Well, we're not arguing for our instruction based on just a mere fraud. I think the facts of this case do meet... I should say a fraud only on the Railroad Commission. That's right. The facts of this case meet that especially likely standard that was articulated in Exxon. Because you participated, your predecessors participated in the negotiation. That's correct, Your Honor. If I could, and amongst other reasons, and we lay this out in the blue brief on pages 70 through 76, in that there's a long history of CRIMAR being involved with the standard-setting organization, being aware and understanding what these letters of assurance mean, why they're submitted, who will be relying on them. It's not just the fact that they made a misrepresentation or omission to the IEEE. It's the fact that CRIMAR, through its CEO, knew, in fact, that those participants, including ALE's predecessors, would, in fact, rely on that letter of assurance. Just to quickly turn to the damages, Mr. Cohen, through the briefing, has tried to turn this into a question on whether or not this is a question of admissibility of these litigation settlement agreements. That's not the dispute. The question is whether or not their damages expert satisfied the legal requirements for apportionment articulated under Syro and Erickson. He clearly did not. He was asked at trial whether or not he attributed any quantitative value to the standard. Can I just clarify something? There were two different things going on, both of which might be called apportionment. One of them is apportioning within the product, between the patented features and the non-patented features. When you move to exclude his testimony, Judge Love said, you're wrong about that. He's done that. The second one is giving some value to the standardization. In his initial submission, he said, I don't even have to try to do that because of the non-existence of non-infringing alternatives. Judge Love said, no, no. The Federal Circuit says you have to try to do it. But you can actually rely on this expert, Dr. Mattacetti's views about non-infringing alternatives. That's obviously relevant. Then he went back and he said, now I'm going to value the standardization. I think ultimately that value is so small that it doesn't change my bottom line. What's wrong with that? Well, I think in the first instance, it shows that he really didn't value the standard because in his first report, he says, I don't have to value the standard and it's $2.50 a port. Then when he was specifically instructed by the court, no, I want you to value the standard, he comes back in a second report and says, oh, it just turns out, by the way, that what I'm doing. Then when you moved, you moved and said, that's bad. The judge said, no, no, actually he's fine now except for one sentence. I strike the one sentence. I think the issue I would take with that, Your Honor. It's on page 85 or something. Something like that, yes. I think the issue I would take with that is it's not based on a reliable economic analysis. In CSIRO, this court criticized qualitative statements based on a patent's value or importance without it being rooted in a quantitative market analysis. That's exactly what's taking place here. Dr. Mr. Mills has provided no quantitative analysis as to the value of the patented features versus unpatented features, and he's provided no quantitative analysis as to the value of the standardization. That, by definition, is unreliable. He was allowed to testify at trial just into the qualitative importance. I relied on Dr. Mattacetti, and I think this invention is really important, so I'm going to give it all this value, and I think, based on Dr. Mattacetti, this invention drove demand for the standard. How do you think he should have proceeded to do something quantitative? Well, there's a lot of different things he could have done. He could have done market surveys. He could have valued the cost of the technology to implement the power of Ethernet standard like our expert did. He could have done... Our expert, Mr. Bakewell, went back and looked at non-infringing alternatives that were available to the IEEE before the implementation of the standard, and he analyzed those costs because they weren't tainted by patent hold-up and valuation of standardization. It was a very clean way to look at what it would have cost to do the accused features in the POE standard prior to standardization. He could have done something like that, but he didn't. Even though your friend didn't specifically address the exceptional case, I think the discussion of fraud initially did come up in connection with the exceptional case. So to that extent, you can respond. Oh, thank you, Your Honor. I intended to keep my rebuttal strictly to the exceptional case. In this case, ALE chose to litigate vexatiously to maintain an entire barrage of weak to meritless claims, counterclaims, defenses up until and even during trial. It acted unreasonably throughout. For a case that was worth less than a million dollars at trial. In fact, the jury only awarded $324,000. The fact is, when a litigant maintains weak to meritless claims and defenses when they are belied by the facts, only to put undue pressure on a litigant, that is by definition under octane fitness, an exceptional case. Unfortunately, the district court abused its discretion when it ignored ALE's antitrust counterclaim for which it never intended to try and test the merits. It ignored the fact that like a justicam, ALE defied the court's claim construction order and maintained its operational state argument. It ignored the fact that it maintained all of these weak to meritless claims and defenses right up until pretrial, dropped all of its invalidity during trial. The fact is, it stands here today still incapable of meeting the elements of fraud. It never showed the jury a contract. These inventorship on derivation, these are the issues that it decided to try to the jury as opposed to its myriad of other claims and defenses. These are the ones it decided to try and test the merits. Fraud, breach of contract, implied license, derivation. The so-called main inventor, Mr. Bankey, admitted at his first deposition the concepts for the inventions came from crime art, certainly came from CMS. At his next deposition, Mr. Bankey said he does not consider himself the sole inventor and yet ALE persisted and maintained that he was in fact the true inventor. And at the end of the day, had they won on that claim, the patents could have been corrected. The whole purpose and litigation strategy has simply been to force crime art to accept pennies on the dollar, which is the definition of an exceptional case. I hope this court reverses. Thank you.